IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

IN RE:

KRISTOPHER JOHN SURATT,

        Debtor.          Case No. 05-08137-8-JRL
                                          Chapter 13

## ORDER

This case is before the court on Tom and Teri German's objection to confirmation of the Chapter 13 plan. On January 31, 2006 through February 1, 2006, the court conducted an evidentiary hearing on this matter in New Bern, North Carolina.

### Statement of Facts

From approximately June 2002 through July 2004, the debtor's father operated a sole proprietorship known as Cutting Edge Construction. In July 2004, when the debtor's father filed for relief under Chapter 13, he conveyed ownership of the business to the debtor who was only 21 years-old at the time. The debtor encountered financial difficulties in attempting to operate Cutting Edge Construction. On September 2005, Cutting Edge Construction went out of business. On October 3, 2005, the debtor filed for relief under Chapter 13.

Prior to filing bankruptcy, on March 31, 2005, the debtor obtained a loan that he used to pay off a motorcycle and to purchase a 1991 GMC Vandura box truck for the business. In July 2005, the debtor entered a construction contract with Tom and Teri German ("the Germans") whereby the debtor was to construct an addition to the Germans' residence in Jacksonville, North Carolina, in exchange for payment

1

of $24,097.71. The debtor requested that the Germans pay 75% of the contract price up front. Ms. German testified that she had received 10 different estimates for the project, but that she liked the debtor's presentation because he was a young man attempting to build a business. She said that she could relate to the debtor because she had three children who were in their twenties. Ms. German testified that she had no experience dealing with construction contracts, and she did not realize that an advance payment of 75% was unusual. On July 27, 2005, the Germans made a payment of $18,073.28 to the debtor.

Before entering the contract with the Germans, the debtor contracted with Sheri Branham of Richlands, North Carolina, to construct a two-level deck and a porch with a roof. The debtor juggled his time between the German project and the Branham project. Approximately three weeks after acceptance of the Germans' advance payment, the debtor started the German project. The Germans asserted that the debtor and his crew worked sporadically on the project and provided substandard results. Specifically, the Germans discovered that the foundation wall was uneven and that dirt, rather than concrete, had been used to fill the cinder blocks.

The Germans became very dissatisfied with the quality of work being performed on the project and the amount of time it was taking to complete the work. The debtor represented to the Germans that he had completed $6,000.00 of work on the project, which he attempted to substantiate with receipts. The remainder of the Germans' funds had been used on the Branham project. The debtor intended to have enough funds to complete the German project upon receipt of final payment on the Branham project. Because of delays on the Branham project and Ms. Branham's dissatisfaction with the work, the debtor's ability to fund both jobs became infeasible. The Germans requested a refund of their money. The debtor could not provide a refund, but he proposed to finish the project without any additional charges for labor

if the Germans would pay for the needed supplies up front. While the debtor's offer would not have exceeded the original contract price, it would have required the Germans to pay the remaining contract amount prior to completion of the project. The Germans rejected the offer, as they lacked confidence in the quality of work being performed on the project.

The debtor made another offer to pay the Germans $126.00 for 11 months. He proposed to sell his box truck and his father's tractor to come up with the money for a payment plan. The Germans found that offer to be unsatisfactory, as they had taken out a loan for the construction project and were paying $255.42 a month on that loan. The Germans could not afford to hire anyone else to complete the project, and Mr. German is still in the process of completing the project himself. Despite their difficulties with the debtor d/b/a Cutting Edge Construction, the Germans did not believe that the debtor intended to defraud them at the time of contracting.

Regarding the Branham project, the total contract price was $14,144.04. Ms. Branham paid a 75% advance sum of $10,608.03. When Ms. Branham inquired why the debtor needed 75% up front, the debtor told her that he was new in the business and did not have credit or experience for any alternative arrangement. Ms. Branham believed the debtor was very humble and would do a fine job on her project in order to prove himself in the construction business. Ms. Branham testified that, like the Germans, she had a son in his twenties.

Ms. Branham said that, from the inception of the project, she was displeased with the job performance. The debtor's work crew failed to complete full days of work on the job site. Ms. Branham was dismayed at the length of time it was taking the debtor and his crew to complete her project, and she found the quality of work to be substandard. For example, upon installation of the new roof on the front

3

porch, the roof began to leak. The debtor had to pay for a roofer to come and correct the problem. In addition, Ms. Branham complained that the debtor did not know how to order the proper quantity of materials for the job, and that the debtor's work crew dumped excess amounts of concrete in her front yard. Ms. Branham stated that the project was never completed and that she was forced to pay other companies to correct and/or finish the job. During the course of the project, Ms. Branham paid the debtor an additional $3,800.00 and amended her contract with the debtor to include certain side projects to be completed in addition to the originally contracted work. Towards the end of the debtor's work on the Branham project, the debtor became ill and was rarely on the project site. Despite her difficulties with the debtor, Ms. Branham did not believe that the debtor intended to defraud her at the time of contracting.

At the time of undertaking the German and Branham projects, the debtor had approximately $116.00 in the business checking account. When the debtor received the advance payments from the Germans and Ms. Branham, the debtor deposited the bulk of the funds into the business checking account but cashed a portion of those funds. When asked what he did with the cashed funds, the debtor stated that he used them to pay for supplies, as a number of suppliers would not accept checks from Cutting Edge Construction after his father declared bankruptcy. The debtor also stated that he used the cashed funds to pay employees.

The debtor admitted that, in order to be successful, both the German and Branham projects had to run like clockwork because he had no monetary cushion. The debtor had faith that the projects would run smoothly because he had hired the bulk of his crew members through a personnel service that was screening for skilled and competent employees. Nevertheless, the debtor discovered that some of the employees were using illegal substances while on the job. The debtor had difficulty maintaining a work

4

crew.

On August 30, 2005, the debtor took out a loan and cashed $2,330.44, which he spent towards the Branham project. The debtor asserted that, while he received almost $14,000.00 in payments on the Branham project, he spent approximately $23,000.00 on that project.

The debtor holds a building privilege license in Onslow County, North Carolina. Because he is not a general contractor, he is only permitted by law to enter contracts of less than $30,000.00. The debtor explained that the advertisement appearing in the Jacksonville Yellow Pages stating that the business was "Fully Lic and Insured" meant that it was fully licensed to do projects under $30,000.00. The Onslow County Office of Code Enforcement has a "Certification as to Status of Licensure" that is designed for a general contractor who has undertaken a contract of $30,000.00 or more. At the hearing, the Germans provided a copy of a certification, dated July 11, 2005, listing Kris Suratt d/ba/ Cutting Edge Construction with the applicable license number. The debtor said that he was unaware of this certification until the § 341 meeting, and that his father signed it on his behalf in order to obtain permits for projects. The debtor stated that the subject form is the only form offered by Onslow County for purposes of obtaining permits, that he was not holding himself out as a general contractor, and that his building privilege license number was clearly listed on the certification. While Ms. German testified that the debtor represented himself as a general contractor, Mr. German did not recall that representation. In fact, Mr. German remembered the debtor telling him that he could not perform a job of $30,000.00 or more. Both the German project and the Branham project were under $30,000.00.

The debtor is currently working 40 hours a week at $10.00 an hour for an employer in the construction industry at Topsail Island, North Carolina. The debtor's gross monthly wages are

5

approximately $1,600.00. The debtor intends to work overtime on the weekends to further supplement his income. The debtor's wife is pregnant and is not seeking employment. The couple lives in the home of the debtor's parents. The debtor testified that, aside from working, he and his wife live a meager lifestyle at home. During the hearing, it was revealed that the debtor and his wife had taken a weekend trip to Myrtle Beach, South Carolina, in the midst of the subject projects. The debtor testified that it was a two-night excursion totaling $214.00.

The debtor intends to retain the 2004 Honda GRF 250 dirt bike worth approximately $4,952.00 and the 1996 Ford F250 worth approximately $11,000.00 and pay for these vehicles inside the plan. The debtor also intends to keep the 1991 GMC Vandura worth approximately $4,000.00 that he owns jointly with his mother free and clear of liens. The debtor testified that his mother is on the title of the Vandura because he is on a joint insurance plan with her. While the box truck is currently not in use, the debtor dreams of one day utilizing it as a motorcycle transport. The debtor intends to surrender his 2003 Dodge Ram 1500 worth approximately $22,475.00.

## Analysis

In order for a plan to be confirmable under Chapter 13, the debtor must have proposed the plan "in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). To determine whether a plan meets the good faith standard under § 1325(a)(3), a court must examine the totality of the circumstances on a case by case basis. Solomon v. Cosby (In re Solomon), 67 F.3d 1128, 1134 (4th Cir. 1995); Neufeld v. Freeman, 794 F.2d 149, 152 (4th Cir. 1986). Factors to consider include but are not limited to:

the percentage of proposed repayment to creditors, the debtor's financial situation, the

>period of time over which creditors will be paid, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing the facts of the case, the nature of the debtor's pre-petition conduct that gave rise to the debts, whether the debts would be dischargeable in a Chapter 7 proceeding, and any other unusual or exceptional problems the debtor faces.

Solomon, 67 F.3d at 1134. The court must consider relevant factors keeping in mind that "the good faith inquiry is intended to prevent abuse of the provisions, purpose or spirit of Chapter 13." Id.

In the case at bar, while the debtor's proposed plan provides only a 2% repayment to unsecured creditors, the debtor is proposing to pay $425.00 over a 57-month period rather than a plan period of 36 months. The debtor's financial situation is bleak. He is a 22-year-old man with a high school education. He and his pregnant wife live with his parents and have few assets of their own. The debtor is currently employed doing construction work that pays $10.00 an hour. He is regularly working 40 hours a week, but he has the option of increasing his hours by working on the weekends. With a baby on the way, the debtor's expenses are expected to increase. The debtor's employment background is in the construction industry. Given his limited education and the problems that he faced while running his own construction business, it seems that his prospects are somewhat limited and that a $10.00 an hour construction job is appropriate for him.

According to Schedule F, the debtor owes $56,496.00 to creditors holding unsecured nonpriority claims. While the debtor's two biggest unsecured creditors are the Germans and Ms. Branham, the debtor is faced with debts to other unsecured creditors, including AtWork Personnel Services, Capital One, payroll guarantors, and unpaid employees. The debtor has also incurred significant medical bills.

The debtor has not previously filed bankruptcy, and no assertions have been made that the debtor's schedules are inaccurate. While the testimony of the witnesses revealed that there was some confusion

7

regarding whether or not the debtor was a general contractor, the court cannot find that the debtor was dishonest in his representation of the facts. Under North Carolina law, a general contractor may undertake projects of $30,000.00 or more. N.C. Gen. Stat. § 87-1. The debtor is not a general contractor, and he limited the contract amounts on the German and Branham projects to under $30,000.00.

Clearly, the debtor lacked the experience, skills, and perhaps maturity necessary to run his own construction business. However, inexperience and ineptitude do not amount to bad faith. In re Casteel, 207 B.R. 185, 188 (Bankr. E.D. Ark. 1997). Both the Germans and Ms. Branham let their hearts control their business judgment. Having children in their twenties, they empathized with the debtor as he attempted to build his business. However, paying 75% up front on a project was contrary to common practice and was a risky move. Despite their problems with the debtor, neither the Germans nor Ms. Branham believed that the debtor intended to defraud them when he contracted with them. Moreover, the testimony supports that, during the course of the projects, the debtor was simply and desperately over his head. He took out a loan in an effort to complete the Branham project, and he made a number of offers to the Germans in an effort to appease them. However, both projects were unsuccessful. While the debtor pooled the draws from each of the projects into one general operating account, nothing in the contracts dictated otherwise. Utilization of a general operating account is permissible. *See* Munro v. DesChamps Building Corp. (In re DesChamps Building Corp.), 03-00159-8-JRL (Bankr. E.D.N.C. Jan. 7, 2005). The witnesses provided no evidence that the debtor was using project funds for personal consumption. While there was mention of a trip to Myrtle Beach for $214.00, there was no evidence that the debtor improperly used project funds to pay for that trip.

8

### **Conclusion**

Based on the totality of the circumstances, the court concludes that the debtor proposes his Chapter 13 plan in good faith with the exception that a few adjustments must be made to the plan in order to more fully accommodate the unsecured creditors. In order to have a confirmable plan, the debtor shall extend the repayment period to 60 months. The 2004 Honda GRF 250 dirt bike shall not be paid as a secured claim, which will increase the distribution to general unsecured creditors. The Germans and Ms. Branham shall be treated as a special class of unsecured creditors. The debtor must turnover the 1991 GMC Vandura to the Chapter 13 trustee. The trustee will liquidate the Vandura and distribute the proceeds from its sale pro rata to the Germans and Ms. Branham in satisfaction of their claims in addition to whatever they receive as general unsecured creditors. The debtor, as well as his mother who shares an interest in the Vandura, conceded to these terms.

**So Ordered.**

**Dated:  March 2, 2006**

J. Rich Leonard
United States Bankruptcy Judge